1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MAGISTRATE JUDGE MICHELLE L. PETERSON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. MJ19-344-MLP |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | RESPONSE TO GOVERNMENT'S MEMORANDUM IN SUPPORT OF MOTION FOR DETENTION |
| | ) | |
| PAIGE THOMPSON, | ) | |
| Defendant. | ) | Hearing Date: August 23, 2019 |
| | ) | |

Paige Thompson, by her attorneys, Mohammad Ali Hamoudi and Christopher Sanders, respectfully moves this Court to order her released from custody under the Bail Reform Act and the Fifth Amendment's Due Process Clause. Supreme Court precedent makes it unconstitutional for this Court to detain Ms. Thompson when there is no basis under 18 U.S.C. § 3142(f) for a detention hearing. The government asks this Court to detain Ms. Thompson on improper grounds: "both as a significant danger to the community, and as a risk of non-appearance." Dkt. 13 at 7. We object to the Court holding a detention hearing. The Court should order her released under § 3142.

Binding precedent has held that "danger to the community" is not a permissible basis for detention because it is not one of the enumerated factors set out in 18 U.S.C. § 3142(f). An ordinary or abstract risk of flight is not a permissible basis for detention; rather, detention is proper if there is a "*serious risk* that [the defendant] will flee." *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985); 18 U.S.C.

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 1

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

§ 3142(f)(2)(A) ("The judicial officer shall hold a hearing . . . in a case that involves–(A) a serious risk that such person will flee[.]"). After the government demonstrates that there is a serious risk of flight, the government still carries the burden to demonstrate that no "condition or combination of conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial." *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988); 18 U.S.C. § 3142(e). The government has failed to meet any of these burdens. Ms. Thompson must be released on bond immediately "subject to the least restrictive conditions." 18 U.S.C. § 3142(c)(1)(B).

## I.   The Bond Statute Only Authorizes Pretrial Detention and a Detention Hearing When One of the Seven Factors Listed in § 3142(f) Is Met.

### A.   Supreme Court Law

In *United States v. Salerno*, 481 U.S. 739, 755 (1987), the Supreme Court upheld 18 U.S.C. § 3142 over a substantive due process challenge on the grounds that detention hearings could be held *only* under the limited circumstances set out in § 3142(f). The Court held: "[t]he Bail Reform Act *carefully limits the circumstances under which detention may be sought* to the most serious crimes. *See* 18 U.S.C. § 3142(f) (*detention hearings available if* case involves crime of violence, offenses for which the sentence is life imprisonment or death, serious drug offenders, or certain repeat offenders)." *Salerno*, 481 U.S. at 747 (emphasis added). *Salerno* makes clear that when no § 3142(f) factor is present, a court is statutorily and constitutionally prohibited from holding a detention hearing and is required to release the defendant on conditions.

To avoid the due process violation, the Court focused on the fact that § 3142(f) "carefully limits the circumstances under which detention may be sought." *Id.* The Court contrasted the Bail Reform Act with a statute that "permitted pretrial detention of any juvenile arrested on any charge" by pointing to the gatekeeping function of § 3142(f): "The Bail Reform Act, in contrast, narrowly focuses on a particularly acute

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 2

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

problem in which the Government interests are overwhelming. The Act operates *only on individuals who have been arrested for a specific category of extremely serious offenses.* 18 U.S.C. § 3142(f)." *Id.* at 750 (emphasis added). The Court stated the balance between the government's interests and a defendant's fundamental right to liberty, but found that "Congress' careful delineation of the circumstances under which detention will be permitted satisfies this standard." *Id.* at 751. The Court stated that the only defendants for whom the government can seek detention are those who are "already indicted or held to answer for a *serious* crime," meaning the "extremely serious offenses" listed in § 3142(f). *Id.* (emphasis added). Six courts of appeal agree that it is illegal to detain a defendant unless the government establishes one of the factors listed in § 3142(f). *See, e.g.*, *United States v. Twine*, 344 F.3d 987–88 (9th Cir. 2003); *United States v. Ploof*, 851 F.2d 7, 11 (1st Cir. 1988); *Friedman*, 837 F.2d at 49; *United States v. Himler*, 797 F.2d 156, 160 (3d Cir. 1986); *United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992); *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999).

The gatekeeping role § 3142(f) plays is clear from the plain language of the statute. Subsection 3142(f) says, "the judicial officer shall hold a [detention] hearing" only "in a case that involves" one of the seven factors listed in § 3142(f)(1) and (f)(2). The government's motion acknowledges the gatekeeping function served by § 3142(f). Dkt. 5. It reads, "This case is eligible for a detention order because this case involves (check all that apply)," and provides a checkbox for each § 3142(f) factor." *Id.* The government has checked serious risk of flight.

The government must first establish that there is a "serious risk" that Ms. Thompson will flee. 18 U.S.C. § 3142(f)(2)(A). Even if that burden is met, the government must further establish that no "condition or combination of conditions of release will protect the safety of the community and reasonably assure the defendant's

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 3

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

appearance at trial." *Friedman*, 837 F.2d at 49. Release is the presumptive state. 18 U.S.C. § 3142(b) and (c).

## B. Serious Risk of Flight Defined

"[T]he government must establish [a serious] risk of flight by a *clear* preponderance of the evidence." *Motamedi*, 767 F.3d at 1406 (emphasis added). *Motamedi*'s standard is higher than the ordinary preponderance standard. *United States v. Portes*, 786 F.2d 758, 765 n.2 (7th Cir. 1985). *Motamedi*'s standard tracks the demanding standard intended by Congress when it passed the law:

> Under subsection [3142]f(2), a pretrial detention hearing may be held upon motion of the attorney for the government or upon the judicial officer's own motion in two types of cases. The two types of cases involve either a serious risk that the defendant will flee, or a serious risk that the defendant will obstruct justice, or threaten, injure, or intimidate a prospective juror or witness, or attempt to do so, and *reflect the scope of current case law that recognizes the appropriateness of denial of release in such cases.*

Bail Reform Act of 1983: Report of the Committee on the Judiciary, S Rep No 98-147, 98th Cong, 1st Sess. 48 (1983) (emphasis added).

The footnote for this text cites to *United States v. Abrahams*, 575 F.2d 3 (1st Cir. 1978), to represent the "scope of the current case law." In *Abrahams*, the First Circuit held that, before detaining a defendant as a risk of flight, the government must show a "rare case of extreme and unusual circumstances"; *see also Gavino v. McMahon*, 499 F.2d 1191, 1995 (2d Cir. 1974) (holding that in a noncapital case the defendant is guaranteed the right to pretrial release except in "extreme and unusual circumstances"); *United States v. Kirk*, 534 F.2d 1262, 1281 (8th Cir. 1976) (holding that bail can only be denied "in the exceptional case"). The extreme and unusual facts in *Abraham* show what Congress intended the standard to be: the defendant was an escaped felon who fled to Florida; he had access to money and aliases; and he had used aliases. *Abraham*,

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 4

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

575 F.2d at 4–8. The Ninth Circuit has adhered to this standard since the passage of § 3142:

- *Motamedi*, 767 F.3d at 1407–08 (court erred in detaining Motamedi as a serious risk of flight based on the fact that he was charged with serious offenses (exporting military weaponry); the evidence was overwhelming; Motamedi's foreign citizenship; and Motamedi's access to large amount of money).

- *United States v. Townsend*, 897 F.2d 989, 993–94 (9th Cir. 1990) (court did not err in detaining three defendants as a serious risk of flight based on the fact that defendants faced sentences ranging from 35–70 years; all three were foreigners with residences abroad; the defendants had no ties to the Western District of Washington; and the defendants had access to large amounts of cash).

- *United States v. Winson*, 785 F.2d 755, 757 (9th Cir. 1986) (court did not err in detaining defendant charged with a violent offense as a serious risk of flight based on fact that he had a criminal history; was unemployed; had no ties to the community; had lived in the community for a few months; was on parole and probation from another jurisdiction; and admitted that he had committed the charged offense).

**C.    The Government Has Not Met Its Burden by a Clear Preponderance of the Evidence that Ms. Thompson Poses an "Extreme and Unusual" Risk of Fleeing the Jurisdiction.**

The government argues that Ms. Thompson should be detained because she is a "risk of flight." Dkt. 13 at 11. This legal standard is incorrect. The government factually argues that Ms. Thompson should be detained because "she has a history of mental-health issues and of severely erratic and bizarre (and often violent) behavior, despite her participation in treatment programs." *Id.* Ms. Thompson disputes the claim that she is violent. The government cannot establish by a clear preponderance of the evidence that she poses an extreme and unusual risk of fleeing the jurisdiction because she "has a history of mental health issues." *Id.*

1    Ms. Thompson disputes these allegations and the characterizations assigned to

2  them by the government. None of the allegations cited to by the government

3  demonstrate that Ms. Thompson presents a serious risk of flight. Dkt. 13-1. The first

4  one, from October 24, 2018, involves her sending a text and leaving a voice message.

5  *Id.* at 2. The report says nothing as to Ms. Thompson running away from the police or

6  fleeing the jurisdiction. The *ex parte* petitions against harassment, *id.* at 3–26, which are

7  also from October 24, 2018 and relate to the previous incident, accuse her of engaging

8  in "annoy[ing]" and stalking behavior. *Id.* at 7. They too say nothing about

9  Ms. Thompson running away from the police or fleeing the jurisdiction. The next cited

10  conduct, in fact, demonstrates that Ms. Thompson does not present a serious risk of

11  flight. *Id.* at 28–30. It is alleged that, on March 24, 2019, the police arrived at

12  Ms. Thompson's house following a "report of a domestic disturbance." *Id.* at 28. Rather

13  than flee or run away, Ms. Thompson remained, cooperated with law enforcement, told

14  her side of the story, and waited with the police until an ambulance arrived to take her

15  to Swedish Medical Center. *Id.* at 28–29. As Diane Eakes, the person involved in the

16  incident, declares:

> This report does not accurately reflect what transpired on the night of
> March 24, 2019. Ms. Thompson has never made serious threats of
> 'suicide by cop.' On the night of March 24, 2019, Ms. Thompson had
> been feeling very frustrated. She had no money and no job and hadn't
> been employed for a long time. She was not leaving the house and was
> becoming increasingly agitated about her life. Ms. Thompson started to
> make a lot of noise and I found it irritating. I made Ms. Thompson leave
> the residence. Ms. Thompson was not 'banging' on the windows that
> evening. Ms. Thompson was not 'banging' on the walls that evening. The
> 'fake gun' that the police wrote about was a neon orange squirt gun. No
> one took her fake gun threat seriously because the 'gun' was a neon
> orange squirt gun. The police saw the orange squirt gun. I believe that
> Ms. Thompson was hoping to get kicked out of our home that night and I
> understand her frustrations. I know what Ms. Thompson will and won't
> do, and she will not harm others. Ms. Thompson pushes people away and
> that is what she was trying to do on March 24, 2019.

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 6

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Exhibit 1 at 1.

The last allegation, involving a threat to a social media company, also proves—even though she does not have to burden to prove anything—that Ms. Thompson is not a serious risk of flight. *Id.* at 31–34. When officers followed up to investigate the threat, they concluded she "had no monetary or transportation means to come to California." *Id.* at 34. The report further suggests the cooperative relationship she has with law enforcement: "I am familiar with Paige Thompson and my unit has a response plan for her." Dkt. 13-1 at 32. Rather than establish that these incidents prove Ms. Thompson is a serious risk of flight, the government has established that she cooperates with law enforcement, does not flee, and has no means to leave the jurisdiction. The nature and circumstances of the current offense suggest a similar pattern. Dkt. 13 at 9; Dkt. 15. Ms. Thompson has no arrests and no failures to appear. There is no evidence before this Court to suggest that she will not make her Court appearances. "The purpose of a Section 3142(e) risk of flight determination…is not to detain [a person who has had contact with law enforcement or has a restraining order filed against them]; it is to secure the appearance of the accused at trial." *Himler,* 797 F.2 at 161.

Defendants with criminal histories who are facing significant sentences, charged with much more serious offenses than Ms. Thompson, and who also live with mental health issues are released in this district on bond on a regular basis. *United States v. Godsey*, 18-CR-115-RAJ, Dkt. 14; *United States v. Jones*, 18-CR-271-RSL, Dkt. 20; *United States v. Crawford*, 16-MJ-05106-DWC, Dkt. 12. Under § 3142(c)(1)(A), which mandates the imposition of "least restrictive...condition[s]," courts in this district order the release of such individuals and further order them to "[u]ndergo a mental health, psychiatric or psychological evaluation and follow all treatment recommendations in that evaluation...." § 3142(c)(1)(A). Ms. Thompson has already undergone such an evaluation with Dr. Matt Goldenberg. Exhibit A (filed separately under seal). He

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 7

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

recommends "that Paige be moved as soon as possible to a halfway house that will allow her to access her [clinical] care team...." *Id.* at 7. Dr. Goldenberg further states that "[i]n terms of optimal mental health care, Paige should be seen at an agency that is specifically suited to work effectively with transgender people because transgender people face a unique set of mental health challenges as well as quality of life impairments not seen in other populations." *Id.* Her treatment provider concurs: "[A]n interruption in her mental health therapy would be detrimental to her health and well-being." Exhibit B at 1 (filed separately under seal).

Release is the presumptive state. 18 U.S.C. § 3142(b) and (c). It is not Ms. Thompson's burden to provide "sound rationale why she would fa[re] differently under court-imposed conditions," even though she already has done so. *Compare* Dkt. 13 at 11 *with* Exhibits A & B. Short of speculating that the "immense added stress caused by her current circumstances presumably will only serve to intensify the unpredictability of her future actions," Dkt. 13 at 11, the government has done nothing to support a contention of a serious flight risk when Ms. Thompson clearly has every incentive to remain in the jurisdiction given her current circumstances. Dkt. 15.

The government further suggests that Ms. Thompson's detention as a serious flight risk is warranted because she has threatened to kill herself in the past, and that "there is no way of ensuring that Thompson … would not, in fact, harm herself." Dkt. 13 at 11. The government cites to no binding precedent that allows Ms. Thompson to be detained as a serious risk of flight because she has suicidal ideations. The factual evidence before the Court demonstrates that she is at a greater risk of self-harm or harm generally at the Federal Detention Center as opposed to the halfway house. As Dr. Goldenberg explains:

> The risk of being continuously misgendered and becoming a target for intimidation by other inmates is likely increased in a male facility. Long-term placement in a men's facility will likely increase Paige's gender

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 8

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

> dysphoria, depression, and risk of suicide. In addition, some changes that Paige has experienced from her use of feminizing hormones are permanent, such as breast growth. It is concerning that Paige may be at increased risk for sexual objectivity if placed long-term with men due to her feminine, secondary sex characteristics.

Exhibit A at 6.

Based on well-documented trends in pretrial facilities, the American Civil Liberties Union (ACLU) is seriously concerned for Ms. Thompson's safety, advocates for her release to a halfway house, and explains the risks as follows:

> Though all confinement poses these risks, a pre-trial facility poses particularly high risks. Whereas upon sentencing, Ms. Thompson could potentially be sent to a facility with the capacity to set up a system to protect her from abuse in the least restrictive setting, at a pre-trial facility the population is transient and any security is short-lived and disrupted by the regular influx of new detainees. For Ms. Thompson, a transgender woman who stands out among the male population, this also means that she has to regularly adapt to manage the inevitable threats to her bodily safety. This level of vigilance can only be sustained for so long before her health will deteriorate. The solution to this vulnerability is not protective custody, which will only increase her risk of assault and further jeopardize her health.

Exhibit 2, ACLU letter, at 2.

The threats to Ms. Thompson's safety and the risk of suicide are elevated by the amount of time the government expects to keep her detained. "The government is continuing its investigation, which will take a significant amount of time and resources, given the immense amount of forensic evidence to review." Dkt. 13 at 6. There have been suicides and attempted suicides at the SeaTac Federal Detention Center, one of which involved a defendant on suicide watch; defense counsel received reports of a suicide attempt as recently as few weeks ago. And Jeffrey Epstein in protective custody recently committed suicide by hanging. Ali Watkins and Michael Gold, *Jeffrey Epstein Autopsy Results Show He Hanged Himself in Suicide*, N.Y. TIMES, Aug. 16, 2019, https://www.nytimes.com/2019/08/16/nyregion/jeffrey-epstein-autopsy-results.html. Whatever the abstract of risk of suicide is in this case, the mental health professionals

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 9

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

agree that it is lessened to a significant degree provided Ms. Thompson is at the halfway house and receiving appropriate clinical care for her gender transition.

The government finally argues "[a]s courts repeatedly have recognized, electronic monitoring has many uses, but it does not prevent flight. *See, e.g., United States v. Townsend*, 897 F.2d 989, 994–95 (9th Cir. 1990)." Dkt. 13 at 11. *Townsend* did not hold or state that "courts have *repeatedly* recognized" that electronic monitoring does not prevent flight. *Townsend*'s case, summarized above at Section B, is totally distinguishable from Ms. Thompson's case. Because the government has failed to meet its burden, the Court cannot detain Ms. Thompson as a serious flight risk. The Court must release her since none of the other § 3142(f) gateway factors apply to her case.

### D.   It Is Illegal to Detain Ms. Thompson as a Danger to the Community.

The government asks this Court to detain Ms. Thompson first because she is a danger to the community, and then because she is a flight risk. Dkt. 13. The government misstates the law. By its text, § 3142(f) does not authorize detention on generalized dangerousness grounds. *Himler*, 797 F.2d at 160; *see also Byrd*, 969 F.2d at 110 ("[A] defendant's threat to the safety of other persons or to the community, standing alone, will not justify pre-trial detention."); *Friedman*, 837 F.2d at 49 ("[T]he Bail Reform Act does not permit detention on the basis of dangerousness in the absence of risk of flight, obstruction of justice or an indictment for the offenses enumerated [in the statute].")；*Ploof*, 851 F.2d at 9–12; *Singleton*, 182 F.3d at 9 (citing *Ploof*, 851 F.2d at 11); *Twine*, 344 F.3d at 987 (agreeing with *Himler*, *Ploof*, and *Byrd* stating "[t]his interpretation of the Act would render meaningless 18 U.S.C. § 3142(f)(1) and (2)."). Since the government cannot establish by the clear preponderance of the evidence that Ms. Thompson poses an extreme and unusual risk of fleeing the jurisdiction, the analysis ends.

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 10

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

**E.    Assuming the Government Produces Evidence that Demonstrates Ms. Thompson Poses an Extreme and Unusual Risk of Fleeing the Jurisdiction, the Government's Motion Still Fails Because They Cannot Demonstrate by Clear and Convincing Evidence Ms. Thompson Presents a Danger to the Safety of Any Other Person or the Community.**

Under the Bail Reform Act, if this Court establishes the existence of a § 3142(f) factor, the Court "shall order the pretrial release" of a defendant either on his personal recognizance or under the least restrictive conditions necessary "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b).

"The facts [this Court] uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence." 18 U.S.C. § 3142(f)(2).

**F.    The Government Has Failed to Prove by Clear and Convincing Evidence that Ms. Thompson Presents an Ongoing Threat of Harm to Capital One and to Others.**

The government first argues that Ms. Thompson's placement anywhere else but the Federal Detention Center will not reasonably assure the safety "of approximately 106 million customers"—Capital One customers. Dkt. 13 at 8. The government argues that "[t]he threat or harm to those individuals is massive." *Id.* Both Capital One and the government have made statements to the public to assure them that there is no threat or harm to these individuals. "Based on our analysis to date, we believe it is unlikely that the information was used for fraud or disseminated by this individual." *See* Information on the Capital One Cyber Incident, August 4, 2019, available at https://www.capitalone.com/facts2019/. "We don't have any information that Ms. Thompson used or monetized the data in any way." AUSA Steve Masada interview with NPR, available at https://www.npr.org/2019/07/30/746509206/capital-one-data-

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 11

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    breach-exposes-over-100-million-customers. The same is true as to the other alleged

2    companies. Amazon Web Services (AWS) is the "Cloud Computing Company"

3    referenced in the complaint. Dkt. 1 at 2. On August 13, 2019, AWS wrote a letter to

4    Congress and stated it is not aware of any breaches at other "noteworthy" customers,

5    cautioning that "[i]t's possible that there have been small numbers of these that haven't

6    been escalated to us." Exhibit 3. As to the 30 alleged companies, AWS said it has

7    contacted customers that may have been affected and "[t]o date, these customers have

8    not reported any significant issues." *Id.*

9         The government next argues that Ms. Thompson's placement anywhere else but

10   the Federal Detention Center will not reasonably assure the safety of any other person

11   and the community because "Capital One alone already has been sued in 48 separate

12   cases, has estimated that it will incur $100 to $150 million of additional costs in 2019,

13   and presumably will incur even higher costs before the consequences of Thompson's

14   actions are fully resolved." Dkt. 13 at 8–9. Defendants are released on bond in cases

15   involving actual losses totaling more than $40,000,000 (*see United States v. Spangler*,

16   12-CR-00133-RSM, Dkt. 1 at 17; Dkt. 3), or more than $25,000,000 (*see United States*

17   *v. Hansen*, 18-CR-00092-RAJ, Dkt. 1. at 10; Dkt. 12–13, 91–95). The government's

18   claim that "the company's stock price has dropped approximately 10% since the breach

19   was announced, erasing billions of dollars from the company's market capitalization" is

20   an exaggerated claim. Dkt. 13 at 6. This evaluation does not account for other factors in

21   the market that impacted share prices besides the breach. It appears that the 10%

22   number cited by the government was calculated by using the percent change from the

23   day of the breach until August 13, 2019: "Close 7/29 to close 8/13: -10.02%." *See*

24   https://finance.yahoo.com/quote/COF/.

25        Multiple factors contributed to Capital One's stock devaluing since this case was

26   publicized. The federal government declared a trade war with China. *See*

---

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 12

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1  https://www.cnbc.com/2019/08/01/trump-says-us-will-impose-10percent-tariffs-on-

2  300-billion-of-chinese-goods-starting-september-1.html. And the federal government

3  announced they are lowering the federal funds rate.

4  https://www.federalreserve.gov/newsevents/pressreleases/monetary20190731a.htm.

5  Furthermore, the federal government designated China as a currency manipulator.

6  https://home.treasury.gov/news/press-releases/sm751. As illustrated below, when

7  comparing the Capital One stock price changes to changes in the NYSE Composite

8  Index, S&P 500, and other similar bank stocks, in light of actions taken by the federal

9  government, it is obvious that all are suffering significant declines and thus the changes

10 in the Capital One Stock cannot be solely contributed to the breach becoming public.



21 *See* https://tinyurl.com/y2pnm9kk. Multiple analyses show that data breaches do not

22 hurt stock prices. https://www.comparitech.com/blog/information-security/data-breach-

23 share-price-2018/; https://corpgov.law.harvard.edu/2018/11/20/bull-or-bear-how-the-

24 market-reacts-to-data-breach-news/; https://hbr.org/2015/03/why-data-breaches-dont-

25 hurt-stock-prices.

26

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 13

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    The government next argues that Ms. Thompson's placement anywhere else but

2    the Federal Detention Center will not reasonably assure the safety of any other person

3    and the community because "the weight of the evidence is overwhelming." Dkt. 13 at 9.

4    "[T]he weight of the evidence is the least important factor" because this Court is not

5    permitted to make "a pretrial determination that [Ms. Thompson] is guilty" even if she

6    has provided a full blown confession. *United States v. Motamedi*, 767 F.2d 1403, 1408

7    (9th Cir. 1985) ("[I]f the court impermissibly makes a preliminary determination of

8    guilt, the refusal to grant release could become in substance a matter of punishment.")

9    The matter of pretrial punishment is an issue in this case. As Dr. Goldenberg opines,

10   Ms. Thompson is suffering greater harm in custody because she is transgender.

11   Exhibit A at 6. Ms. Thompson is, in effect, suffering pretrial punishment. This notion is

12   supported by the ACLU's Chase Strangio, who explains how pretrial custody is

13   different than post-sentencing custody for transgender persons. Exhibit 2 at 2. To the

14   extent this Court intends to consider the weight of the evidence, it should do so in light

15   of the totality of the circumstances surrounding that weight. Dkt. 15. There is nothing

16   before the Court to suggest that Ms. Thompson presents a serious threat to another

17   person or the community because the weight of the evidence is too much for her to

18   bear.

19        The government next argues that Ms. Thompson's placement anywhere else but

20   the Federal Detention Center will not reasonably assure the safety of any other person

21   and the community because she would "pose a technological danger." Dkt. 13 at 10.

22   The government has seized "numerous digital devices" and there are no other devices.

23   Dkt. 1 at 12; Dkt. 15. The government has not identified a person or a community as to

24   this argument. As explained above, all the data in this case was seized by the

25   government and AWS has informed Congress that there are no other breaches. The

26

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 14

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

government also has not articulated any legal basis under § 3142 that recognizes technological danger as a basis to detain an individual under these circumstances.

Technological dangers are mitigated against on a regular basis in this district. In child pornography cases, thousands of images of victims are seized from a defendant, some defendants have collected those images for years, and the defendants are charged with offenses with mandatory minimums as little as five years and up to fifteen years. The practice in this district is to release those individuals on bond with restrictions on computer use. *United States v. Delateur*, 18-CR-05364-BHS, Dkts. 1, 10; *United States v. Benson*, 17-CR-05473-BHS, Dkts. 16, 20; *United States v. Giles*, 15-CR-05543-RBL, Dkts. 1, 13; *United States v. Giliam*, 13-CR-05028-RJB, Dkts. 1, 18; *United States v. Dwight*, 14-MJ-05257-DWC, Dkts. 1, 9; *United States v. Smith*, 13-MJ-05179-DWS, Dkts. 1, 11, 15; *United States v. Lobdell*, 15-CR-00394-TSZ, Dkts. 1, 13; *United States v. Brook*, 14-CR-00156-RAJ, Dkts. 1, 18–21; *United States v. Wood*, 18-CR-00190-RAJ, Dkts. 1, 13; *United States v. Morgenstern*, 18-CR-00285-RSM, Dkts. 9, 15-1; *United States v. Tippens*, 16-CR-05110-RJB, Dkt. 15; *United States v. Rockwell*, 19-CR-05294-BHS, Dkts. 1, 12; *United States v. Barnes*, 18-CR-05141-BHS, Dkts. 1, 10. The defendants are released on bond even though there was a presumption of detention. 18 U.S.C. § 3142(e)(3)(E). In Ms. Thompson's case there is no such presumption. And, in the above listed cases, the computers used by the defendants were ordinary computers available to the public, including smart phones.

The computer seized from Ms. Thompson's home was not an ordinary computer but a custom-built computer with unique software. Thus, "Thompson's technical sophistication," Dkt. 13 at 10, to engage in the "if" technical scenarios laid out by the government, is predicated on her ability to access a highly sophisticated machine with similar software, a machine not available at the halfway house. Not only does Ms. Thompson not have the financial means to purchase such a machine, she does not

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 15

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1   have the incentive to do so. Dkt. 15. The government argues that "[t]here are no

2   reasonable assurances that she would not follow through on such a threat in the future."

3   Dkt. 13 at 10. The record contradicts this allegation. In fact, the government itself has

4   presented allegations to the Court that demonstrate Ms. Thompson does not follow

5   through with her threats. Dkt. 13-1. She has never attempted to commit suicide by cop,

6   traveled down to California, or physically harmed anyone.

7        The government finally argues that Ms. Thompson's placement anywhere else

8   but the Federal Detention Center will not reasonably assure the safety of any other

9   person and the community because "Thompson has a long history of threats to kill

10   others, to kill herself, and to commit suicide by cop," "appears [to have] a significant

11   history of mental health problems," is unemployed, is homeless, and may obtain

12   firearms to carry out her threats "particularly when confronted with the alternative of

13   near-certain conviction and imprisonment." Dkt. 13 at 9–10.

14        First, being unemployed and homeless does not make you a danger to another

15   person or the community. Second, as to the suicide risk, setting aside the fact that there

16   is evidence before this Court that Ms. Thompson is at a greater risk of suicide at the

17   Federal Detention Center, committing suicide does not undermine the safety of any

18   other person and the community. The only thing the government has remaining as to

19   this argument is what it characterizes as a "long history of threats to kill others," her

20   "significant history of mental health problems," and the potential that she may obtain

21   firearms. Dkt. 13 at 9–10.

22        This Court cannot legally rely on such characterizations to detain Ms. Thompson

23   because this is nothing more than a generalized dangerousness argument which has

24   been rejected by multiple circuits. Any danger alleged by the government must relate to

25   Ms. Thompson's case, and unrelated allegations of danger to others are insufficient.

26   *Ploof*, 851 F.2d at 7–11; *Byrd*, 969 F.2d at 106; *United States v. Say*, 233 F. Supp. 2d

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 16

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

221 (D. Mass. 2002); *United States v. Bell*, 2007 WL 2314928 (S.D. Tex. 2007) (threats to wife cannot be used to obtain detention on danger grounds in fraud case, even at reopened hearing). None of the individuals identified in these reports, SES, KWS, JB, or Ms. Eakes are witnesses, parties, or related to the case. Dkt. 13-1, Ex.1. Furthermore, this Court cannot rely on allegations to detain Ms. Thompson because she has never been arrested as a result of these incidents, rendering these documents unreliable. "This report does not accurately reflect what transpired on the night of March 24, 2019." Exhibit 1 at 1. Even if she had been arrested, the Court still could not rely on these documents to make a finding that she is a danger to the community. "[T]he parties agree, and the Court can find no legal authority, to support the use of prior arrests which did not result in conviction as a basis for a finding of danger to the community." *United States v. Leyba*, 104 F. Supp. 2d 1182, 1184 n.2 (S.D. Iowa 2000).

In fact, the docket for the order of protection, Dkt. 13-1 at 12–14, 24–26,[1] demonstrates that Ms. Thompson is fully capable of following court orders, which means that she is fully capable of performing well on pretrial release. Since the order was entered, she has not violated it. As to the police reports, it bears emphasis that the reports have not been subject to any adjudicative process. Indeed, the police officers who investigated the matter did not see it fit to cite Ms. Thompson let alone refer the matter to a prosecutor for consideration. The officers did not conclude that she presented a danger to the community at the time that assessment mattered the most, i.e., when the alleged threats were made, when the alleged domestic disturbance occurred, or when the alleged stalking occurred. If Ms. Thompson was not a danger at the time these incidents occurred, no weight can be placed on these allegations whatsoever to suggest that she is a danger today because of them.

---

[1] Although the petitions involve two separate individuals, a comparison of the handwriting on both petitions suggests they were prepared by the same individual. *Compare* Dkt. 13-1 at 4–10 *with* 16–22.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

## II.     Ms. Thompson's History and Characteristics

Ms. Thompson's history and characteristics have been mischaracterized by the government. The snapshots submitted by the government are an incomplete and inaccurate portrayal of a life more fairly described as one of survival and resilience.

Ms. Thompson was born in Kansas City, Missouri, in 1986 and spent her childhood in Arkansas. Even before her transgender transition, Ms. Thompson struggled to fit in. She excelled with computers and dreamed of leaving Arkansas to pursue a career in the technology industry, but challenges at home and in school posed significant obstacles to realizing this dream. Ms. Thompson was born to a single mother with her own challenges. Ms. Thompson's mother and grandparents were ill-prepared to nurture Ms. Thompson's talents and lacked the ability to support her in the gender transition she would face as a teen and young adult.

At the age of six Ms. Thompson was diagnosed with ADHD. Even with medication, the school environment was a poor fit for her, and after her first year of high school Ms. Thompson dropped out. Though she did not have the language for it at the time, Ms. Thompson now recognizes that gender incongruity was a source of isolation and distress during her childhood. This was increasingly the case as she entered into puberty.[2] During her teenage years, as her body began to resemble that of a maturing male, Ms. Thompson's home life deteriorated.

Computers provided Ms. Thompson access to a community she lacked. She made friends who shared her interests. Ms. Thompson left her home for Seattle and built roots in the Pacific Northwest. Aside from a few trips abroad with friends, and a brief time living in Las Vegas, Washington has been Ms. Thompson's consistent home.

---

[2] Am. Psychol. Ass'n, *Report of the APA Task Force on Gender Identity and Gender Variance* 45 (2008), https://www.apa.org/pi/lgbt/resources/policy/gender-identity-report.pdf; Substance Abuse and Mental Health Servs. Admin., *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth* 3 (2015), https://store.samhsa.gov/system/files/sma15-4928.pdf.

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 18

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Away from the dynamics of a family in chaos, Ms. Thompson began the process of transitioning from male to female. Resources for transgender individuals has vastly improved in the decade since Ms. Thompson began her search for support, but the stigma of her existence remains palpable.[3] Her current detention in a men's unit at the Federal Detention Center is one of many examples of the hurdles a woman like Ms. Thompson must overcome to maintain bodily autonomy and safety.

Despite the ever-present risk of job discrimination, housing discrimination, and violence, Ms. Thompson has advocated for herself as best she can. After first finding feminizing hormones over the internet in 2008, Ms. Thompson established care with a gender affirming provider, and she has been under the consistent care of doctors for over a decade now. The emotional and physical challenges inherent to gender transition have at times been compounded by Ms. Thompson's mental health issues.[4] Nevertheless, Ms. Thompson has demonstrated resilience through her willingness to accept help, humility in taking accountability for her sometimes self-destructive cries for help, and her ambition to try again.

Ms. Thompson's resilience is further reflected in her employment history. Transgender women face tremendous barriers to employment.[5] Ms. Thompson has

---

[3] Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals* (2018), https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf.

[4] *See, e.g.*, Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 455, 458 (5th ed. 2013); Stephanie A. Brill & Rachel Pepper, *The Transgender Child: A Handbook for Families and Professionals* 202 (2008) (discussing risk of self-mutilation).

[5] Brad Sears & Christy Mallory, *Documented Evidence Of Employment Discrimination & Its Effects On LGBT People, The Williams Inst.* at 4 (July 2011) (estimating that between 67% and 78% of transgender individuals experience work place harassment or mistreatment); Sandy E. James, et al., National Center for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey* 142-144 (2015), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf (finding that more than a quarter of transgender Americans have been fired, denied a promotion, or simply not hired at all due to their gender identity or expression and that nearly one-third (29%) of

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 19

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    additional challenges as a transgender woman without a high school diploma, working

2    in a technical field largely dominated by men with advanced degrees. Still, she has

3    merited respected positions at businesses like Amazon Web Services. Her current

4    unemployment status does not diminish these professional accomplishments but

5    provides insight into the struggles she has had finding community at her place of

6    employment.

7         It is also noteworthy that Ms. Thompson has no criminal history and has been

8    sober for over three years. It speaks to her character that Ms. Thompson has managed to

9    identify her alcohol and substance use as problematic, and exercise the resolve to live a

10   sober life.

11        Finally, the government has gone to great lengths to suggest to this Court that

12   Ms. Thompson's "longstanding mental-health issues" and use of "psychiatric

13   medications" provide legitimate grounds for pretrial detention. Dkt. 13 at 5. This both

14   mischaracterizes the Court's authority under the Bail Reform Act and capitalizes on the

15   stigma surrounding community members with mental illness. Ms. Thompson suffers

16   from depression. Though her illness is often well-managed, she also experiences

17   symptoms including suicidal ideation. Likewise, Ms. Thompson is not alone in

18   experiencing setbacks as she learns to live with and manage an illness. However

19   common her challenges are, Ms. Thompson understands the consequences of waiting

20   until she is in crisis to seek help. Though she has never hurt another person or attempted

21   to do so, she acknowledges that her social media posts and other communications have

22   scared people. With support and guidance from this Court, these issues can easily be

23   managed with someone who has no criminal history; in fact, they are easily managed in

24   this district with others who have extensive criminal history.

25

26   transgender Americans were living in poverty, more than twice the rate in the U.S. population
     (14%)).

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 20

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

III.    **Conclusion**

Under 18 U.S.C. § 3142(a), (b), (c)(1), Ms. Thompson requests that the Court fashion a bond with the standard conditions including the following special conditions:

- To continue mental health treatment where she currently receives clinical care;
- To continue taking her medication;
- To be placed on active GPS monitoring;
- Halfway house placement with release privileges as determined by Pretrial Services; and
- Any other reasonable restrictions the Court may see fit.

A similar bond was fashioned by Chief Magistrate Judge Tsuchida. *See United States v. Todd Peterman-Dishion*, 19-CR-00126-RSL, Dkt. 22. Mr. Peterman-Dishion is indicted for ten counts of drug distribution and faces a mandatory minimum sentence of ten years to life imprisonment. *Id.*, Dkt. 16. It is not uncommon to use transitional services like the halfway house so individuals like Ms. Thompson can make arrangements to receive benefits, submit housing applications, or find employment approved by Pretrial Services to live independently. As Ms. Eakes states, "Ms. Thompson is welcome back to this house. However, all residents must contribute to rent." Exhibit 1 at 1. Under § 3142(f), the Federal Public Defender has collaborated with Pretrial Services to provide assistance to individuals like Ms. Thompson in the past and is prepared to do so in this case.

//

//

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 21

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    Ms. Thompson is in dire need of placement at the halfway house. For the reasons

2  outlined above, Ms. Thompson requests release to a halfway house with the conditions

3  outlined above.

4    DATED this 20th day of August 2019.

5                                        Respectfully submitted,

6                                        s/ *Mohammad Ali Hamoudi*[6]

7                                        s/ *Christopher Sanders*
                                         Assistant Federal Public Defenders
8                                        Attorneys for Paige Thompson

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
_____
[6] Defense counsel extends gratitude for the research and contributions provided by Willa
26  Osborn, rising second-year student at the University of Washington School of Law, in
    preparing this memorandum.

RESPONSE TO GOVERNMENT'S                          **FEDERAL PUBLIC DEFENDER**
MEMORANDUM IN SUPPORT OF                          **1601 Fifth Avenue, Suite 700**
MOTION FOR DETENTION                              **Seattle, Washington 98101**
(*Paige Thompson*, MJ19-344-MLP) - 22             **(206) 553-1100**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## CERTIFICATE OF SERVICE

I certify that on August 20, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of filing to all registered parties.

s/ *Suzie Strait*
Paralegal

RESPONSE TO GOVERNMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR DETENTION
(*Paige Thompson*, MJ19-344-MLP) - 23

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**